UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ISMAEL MACHADO SEPULVEDA,

Petitioner,

v.

P. COVELLO, Warden, et al.,

Respondents.

Case No.: 19-cv-00337-CAB (JLB)

**ORDER DENYING PETITION AND DENYING CERTIFICATE OF APPEALABILITY**

On February 15, 2019, Petitioner Ismael Machado Sepulveda ("Petitioner"), a California state prisoner proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his state court convictions. (ECF No. 1.) Subsequently, Petitioner filed a First Amended Petition. (ECF No. 13 ("FAP").) On May 30, 2019, Respondent P. Covello ("Respondent") filed the Answer and Memorandum of Points and Authorities in Support of the Answer as well as lodgments of the state court record. (ECF Nos. 9, 10.) On July 1, 2019, Petitioner filed a Traverse. (ECF No. 11.) In granting Petitioner's motion to amend the petition, the Court deemed the Answer and Traverse responsive to the First Amended Petition. (ECF No. 12.) For the reasons set forth below, the First Amended Petition is **DENIED** and the Court **DECLINES** to issue a certificate of appealability.

1

# I. PROCEDURAL BACKGROUND

On January 20, 2017, a jury found Petitioner guilty of lewd acts against B.Z., a child under the age of 14 (counts 1-6), and against P.M., also a child under the age of 14 (counts 7-9), in violation of California Penal Code § 288(a). (*See* ECF Nos. 10-1 at 2; 10-8 at 54-64, 106-08.) The jury also found true the multiple victim allegation on each count and the "substantial sexual conduct" allegation on count 9. (*Id.*) Lastly, the jury found that Petitioner's prosecution on counts 7-9 was timely commenced under former California Penal Code § 801.1(a). (*Id.*) On March 6, 2017, the court sentenced Petitioner to 15 years to life. (*Id.*)

Petitioner filed a direct appeal to the California Court of Appeal. (ECF No. 10-2.) On appeal, Petitioner argued, among other things, that the jurors were instructed incorrectly on the burden of proof for counts 7-9. (*Id.* at 43-70.) Specifically, Petitioner argued that the jury should have been instructed that the People's burden of proof on whether the counts fell within the statute of limitations was proof beyond a reasonable doubt and not preponderance of the evidence. (*Id.*) The California Court of Appeal affirmed Petitioner's judgment of conviction in an unpublished written opinion. (ECF No. 10-1.) The Court of Appeal rejected Petitioner's contention that commencement of a criminal prosecution within an applicable statute of limitations must be proved under the beyond a reasonable doubt standard. (*Id.* at 16-20.) The Court of Appeal also found that there was "substantial evidence in the record to support the jury's findings that the prosecution of counts 7, 8, and 9 was timely commenced" under former California Penal Code § 801.1(a). (*Id.* at 15.) Petitioner filed a petition for review on this issue with the California Supreme Court. (ECF No. 10-3.) On June 13, 2018, the California Supreme Court denied review without comment. (ECF No. 10-4.)

On February 15, 2019, Petitioner filed the present petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his state court convictions. (ECF No. 1.) Subsequently, Petitioner filed a substantially similar First Amended Petition. (ECF No. 13.) Petitioner seeks relief from his convictions on the grounds that (1) the

burden of showing that facially time-barred charges were committed within the statute of limitations is beyond a reasonable doubt and not a preponderance of the evidence, and (2) the jury instructions to the contrary violated the Due Process Clause. (*Id.*) The petition is timely and properly exhausted. (*See* ECF Nos. 1; 13 at 2-5; 10-1; 10-4.)

On May 30, 2019, Respondent filed an Answer and Memorandum of Points and Authorities in Support of the Answer as well as lodgments of the state court record. (ECF Nos. 9, 10.) Respondent contends that the California Court of Appeal did not unreasonably apply Supreme Court precedent in rejecting Petitioner's claims. (*See* ECF No. 9.) On July 1, 2019, Petitioner filed a Traverse. (ECF No. 11.)

## II. FACTUAL BACKGROUND

The facts that follow are taken substantially from the California Court of Appeal opinion, an unpublished written decision affirming the judgment against Petitioner.[1] (ECF No. 10-1.) A presumption of correctness attaches to state court determinations of factual issues on federal habeas review.[2] 28 U.S.C. § 2254(e)(1).

> P.M. testified that she was born on August 22, 1994; that her father, defendant herein, and mother divorced when she was very young; and that after her parents' divorce, she and her older twin brothers had visitations with defendant, particularly on weekends. P.M. testified that during some visits they would travel to Tijuana to visit defendant's family, where they often would stay overnight. P.M.'s last visit or contact with defendant took place in about late August 2002 when she was eight years old, about a week after she disclosed his "[s]exual molestations" of her.

> P.M. testified that defendant molested her on "[m]ore than one occasion"; that these molestations took place both in

---

[1]    As in the California Court of Appeal opinion, the factual overview included herein is limited to victim P.M., as Petitioner does not challenge his convictions with respect to B.Z. (ECF No. 10-1 at 2 n.2.)

[2]    Petitioner does not challenge the factual findings of the California Court of Appeal. (*See* FAP.)

Tijuana[3] and in Chula Vista, where she lived; and that her first recollection of defendant molesting her was when they were at her grandparents' house in Tijuana on what she believed was New Year's Day because she recalled her brothers were setting off fireworks.

On that occasion, P.M. recalled that, while her brothers were outside, defendant took her into her grandparents' room, closed the door, and laid her on the bed. P.M. was fully clothed, as was defendant. According to P.M., defendant then laid on top of P.M., grabbed her arms, and held them near her head so she could not move them. Defendant next began rubbing his "his private part over [her] private part," which she identified as his "penis" on her "vagina," using his knees to exert pressure as he rubbed against her. When defendant finished, he told P.M. not to "say anything" including to her mother, as it was their "secret."

P.M. testified about an incident of sexual misconduct by defendant that took place in Chula Vista about a week before her disclosure. P.M. recalled it was a school day when defendant came to visit them at her mother's condominium. One of P.M.'s brothers called her to come outside and see defendant, who was sitting in the driver's seat of his parked car. Defendant next placed P.M. on his lap, with her legs "sitting across his legs." As she was "facing her brother," defendant began kissing P.M.'s ear and mouth, including putting his tongue inside both.

P.M. testified that she felt uncomfortable as defendant was kissing her ear and mouth; that she wanted her brother to see what their father was doing to her; that her brother instead was looking down at some "paper" while the kissing incident was taking place; and that her brother refused to look up and watch, and was instead "laughing." P.M. was eight years old when this incident occurred.

P.M. recalled another incident of sexual misconduct by defendant that took place inside her mother's condominium. During this incident, her brothers, but not her mother, were

---

[3] (footnote in original) The jury was specifically instructed that defendant was not being charged with any incidents of sexual misconduct that took place in Tijuana, Mexico.

home.  While her brothers were busy playing video games, defendant, who was seated on a couch, picked up P.M. and placed her on his lap, facing him. P.M. testified her legs were around defendant's hips. Defendant next "put a hold on [her] from [her] hips and . . . picked [her] up to his chest, or his stomach," and then dropped her so that her vagina was touching "his private part."  Although defendant repeated this motion several times, according to P.M. her brothers did not see this activity because they were facing the other way. P.M. could not recall exactly when this incident occurred but knew it was before she turned eight years old.

P.M. described another incident that took place at her uncle's house in Tijuana.  During this incident, defendant put his hand inside P.M.'s pants, under her underwear, and rubbed her vagina. P.M. could not recall when this incident took place, only that it was before she turned eight years old.

P.M. described these incidents as being the "most clear" in her mind.  She testified the sexual misconduct by defendant was more or less "ongoing," but that her "mind ha[d] erased a lot of it."  She further testified that she waited to disclose the sexual misconduct by defendant because she was "scared" of him, did not want him to be "mad" at her, and knew her mother would be upset.

However, in early September 2002, P.M. told an older cousin, Angela, about defendant's sexual misconduct.  P.M. testified that Angela was pregnant and had recently moved into their family home for support; and that she looked up to Angela, much like an older sister.  Because Angela was pregnant, P.M. testified that one night she asked Angela whether she (i.e., P.M.) could also become pregnant based on what defendant was "doing to [her]."  On questioning by Angela, P.M. then reluctantly disclosed the sexual misconduct by defendant.

Although P.M. asked Angela not to tell P.M.'s mother about what defendant had done, Angela did in fact tell P.M.'s mother.  The following day, P.M. returned home from school and found several police officers at her home. Crying, P.M.'s mother next took P.M. upstairs and asked P.M. what had happened. P.M. testified she then felt "ashamed" for not telling her mother about the sexual misconduct by defendant. P.M. recalled meeting with

police officers and then going to the hospital to speak with a lady about what had happened. P.M. also recalled speaking to another lady from Child Protective Services (CPS) about defendant's sexual misconduct.

P.M. testified that detectives contacted her in 2014 and disclosed they were reinvestigating her 2002 case. This made P.M. "sad," as she and her mother had just moved to Spain, after P.M.'s depression and anxiety had worsened and P.M.'s doctor had expressed concerns about P.M.'s well-being.

Angela testified that in 2002, she lived with P.M.'s family for about six months; that at the time, she was about 18 years old and pregnant; and that she and P.M. were then close, as she would babysit P.M. when her aunt, P.M.'s mother, worked. Angela recalled in August/September 2002 P.M. was in her room shortly before bedtime. P.M. asked Angela, "Since you're pregnant, do you think I might be pregnant?" When Angela asked P.M., "Why would you ask that?" P.M. responded, "Well, this stuff that is happening to me. I don't know. That might lead to a pregnancy."

On further questioning, P.M. expressed concern about telling Angela "all [of] this" because P.M. was worried her mother might not believe her or even "blame" her for what defendant had been doing. P.M. then disclosed that "every time she went to visit with her father she felt very uncomfortable . . . because he would do stuff to her that she – she pretty much felt uncomfortable." According to Angela, P.M. then asked if Angela's father had kissed Angela on the "on the lips . . . and ears" with his tongue and had "ever touch[ed Angela]." When Angela asked where P.M.'s father had touched her, P.M., who was crying, pointed at her vagina and said her father would "put his hand under her underwear." Angela told P.M. that this touching was "not normal" and that they needed to tell P.M.'s mother because this was "very, very serious."

During this same conversation, P.M. also disclosed that when she and her brothers visited their father he would touch her "every time," including laying on top of her and moving his body in a way to "feel" her body, after her two brothers went outside to play. P.M. further disclosed to Angela that defendant used his tongue when he kissed P.M.; that he would watch P.M. dress and

also touch her body while she was doing so; and that once he even got into the shower with her. P.M. confided that defendant had told her not to say "anything because what he was doing to [P.M.] was pretty bad."

Angela testified that as P.M. was disclosing the sexual misconduct, P.M. appeared angry and afraid. Angela in turn was "very, very . . . upset" and "confused" by P.M.'s disclosure. Angela testified that, during the time she lived with the family leading up to P.M.'s disclosure, Angela had "felt like something was going on" with P.M. and her father because "every time [P.M.] had to go to visit" defendant, P.M. would ask Angela, "Can you keep me? Can you baby-sit me? Can you tell Mom to keep me here? Because I want to stay with you."

Angela testified she told P.M.'s mother about the sexual misconduct by defendant the same night P.M. made this disclosure. Angela stated that P.M.'s mother, Alejandra C., was "very angry" at defendant and attempted to talk to P.M. that same night. P.M., however, did not want to talk to her mother about it and was, according to Angela, very afraid.

Alejandra testified that she was married to defendant for about seven years until they divorced in 1995, when P.M. was about a year old. When Alejandra became pregnant with twins, her sister Norma D. and their mother came to San Diego to help Alejandra. Alejandra estimated Norma lived in their home for about two years, until one day Norma just left.

When her twins were about two years old, Alejandra asked Norma why she left their home and whether anything "had been going on while she was living there." Norma disclosed that defendant was "sexually abusing her" and that she was "very ashamed." Norma told Alejandra that after defendant would drop off Alejandra at work, he would come home and go into Norma's bedroom. Because Norma described this happening "several times," Norma made sure the lock on the door was working and even slept with a knife under her pillow.

Alejandra testified that, after Norma's disclosure, she confronted her husband, who "swore . . . nothing had happened." Alejandra at the time chose to believe her husband and not Norma.

After Alejandra and defendant separated, they agreed to a more formalized visitation schedule. As P.M. became a little older, somewhere between about six and eight years old, Alejandra noted that P.M. sometimes did not want to go on visits with defendant. In May 2002, a few months before P.M. disclosed the sexual misconduct by defendant, P.M. came home from a weekend visit with defendant and complained about having an "irritated vagina." Because P.M. in the past had made similar complaints about her vagina hurting, Alejandra took P.M. to the doctor, who suggested the irritation might be caused by P.M. rubbing herself too hard while bathing or by the soap P.M. was using.

Alejandra recalled when her niece, Angela, disclosed what P.M. had told Angela. Alejandra notified P.M.'s school and the police on both sides of the border. Alejandra testified that she attempted to speak with her daughter P.M. about the sexual misconduct, but that P.M. never wanted to open up to her. At some point after CPS became involved, Alejandra was informed no charges then would be filed against defendant. Defendant's visitation with his children, including P.M., was supervised. Even then, P.M. did not want to visit with him.

Norma testified that Alejandra is her older sister; that when she was about 14 years old, she came to the United States to help because Alejandra was having twins; and that she initially viewed defendant like a brother. After their birth, Norma was the twins' "nanny" when Alejandra worked.

As time went on, defendant began treating Norma like she was his "girlfriend." Norma testified that "[e]very day" defendant would tell her she was "pretty" and "attractive"; that he would make facial gestures toward her including "bit[ing] his lips" and "wink[ing]" at her; and that, as a result, Norma felt uncomfortable around defendant. Norma testified that on one occasion defendant kissed her on the lips while she was sleeping on the couch. On another occasion while she was sleeping, Norma awakened only to find defendant next to her, fondling her breasts over a blanket. On this occasion, Norma got out of bed and went to the kitchen. According to Norma, defendant followed her into the kitchen and asked, "So, what's wrong with that?" and then stated, "There's nothing wrong with that."

Because she felt harassed and scared of defendant, Norma began sleeping in the twins' room. At one point, Norma noticed the "button to the lock" on the twins' door was missing, which caused her to become even more afraid. As a result, Norma began to hide a knife under pillow. She testified she hid the knife in case defendant tried to "force[] himself upon" her.

Norma was questioned by a CPS worker in October 2002. During that interview, Norma disclosed that defendant, while in his underwear, grabbed his penis, moved it side to side, and "lick[ed] his lips" while looking at Norma. Shortly after defendant touched her breasts, Norma moved out. Norma then did not disclose to her sister Alejandra why she had moved out. At some later point, Norma told Alejandra about defendant's sexual misconduct toward her. Alejandra did not believe Norma, however.

Norma recalled when she learned P.M. had disclosed that defendant had engaged in sexual misconduct toward P.M. Norma testified that she and P.M. have never spoken to each other about what defendant did to them.

Both of P.M.'s brothers testified at the trial. Her one brother, Ivan M., testified that he was about 12 years old when P.M. made the disclosure about being molested by defendant; and that, although at trial he could not recall making any statements to CPS during its initial investigation, in late April 2003 he told a social worker he had a "bad feeling" about, and suspected something was happening between, P.M. and their father, but that he then did not speak up because he did not know what that was.

Sergeant Matthew Botkin of the San Diego Police Department testified that in August 2013 he was assigned a sexual molest case involving victim B.Z.; that during B.Z.'s forensic interview, B.Z. disclosed that, while defendant was molesting her, he admitted "he had done the same thing to his daughter"; that on further investigation, Sergeant Botkin learned defendant had been arrested in 2002 but not charged for molesting M.P.; and that Sergeant Botkin thus decided to investigate simultaneously the cases involving B.Z. and M.P.

In connection with his investigation of M.P.'s case,

Sergeant Botkin initiated contact with, and interviewed, M.P.'s brothers, M.P., Alejandra, and Angela among others. Sergeant Botkin noted that even after more than a decade, it was "clearly a very difficult topic for [P.M.] to speak about" what defendant had done to her. According to Sergeant Botkin, neither of defendant's victims (i.e., B.Z. and M.P.) nor their families knew about the other when Sergeant Botkin began his simultaneous investigation into the molests.

Defendant testified in his own defense. Defendant testified that he was affectionate toward his daughter, would "hug" and "squeeze" her; would "give her kisses"; and would "tickle" her and "raise her up" while playing. When asked about the kissing, defendant stated he would give P.M. a "loud kiss" "on her little mouth." Defendant, however, denied using his tongue when kissing P.M., stating that "[n]ever" happened. He admitted to kissing P.M.'s ears occasionally, and noted he also kissed his two sons "in the same way" he kissed P.M.

When asked if he ever kissed P.M. with "any type of sexual intent," defendant testified, "Never." Defendant described how P.M. would "laugh" when he tickled her by "rub[bing his] beard on her neck" and when he "rub[bed]" and "bl[e]w bubbles" on her "tummy" during playtime. When again asked if he tickled P.M. with any type of sexual intent, defendant testified, "Never." Defendant provided the same testimony when asked about his "kiss[ing]" and "nibbl[ing]" of P.M.'s ears and when asked if he had ever used his tongue when kissing P.M.'s ears.

With regard to P.M.'s testimony that defendant molested her while she was sitting on his lap, defendant testified that he often sat P.M. on his lap and hugged her; that sometimes he would sit P.M. on his legs so she was facing him; and that he recalled P.M. sitting on his lap when they were on the couch during visits and when he was behind the driving wheel of his car, when the children would come outside and see him.

As before, defendant testified he never sat P.M. on his lap with the intention of becoming "arouse[d]," nor did he ever move P.M. in "any way in which her vagina would rub on any part of [his own] body," including his penis. Defendant reiterated he "[n]ever" had any sexual intent when he engaged in playtime

with P.M., including when he would "bounc[e] her up and down" or throw her into the air and catch her. Other than when he "clean[ed]," "bathe[d]," and "change[d]" P.M. when she was very young, defendant denied any touching of P.M.'s vagina, including both under and outside her clothing. Defendant also denied sexually molesting anyone else, including his two sons; B.Z.; and Norma, whom defendant described as "[f]lirtatious."

Specifically, with regard to Norma's testimony that he felt her breasts over the blanket while she was "sleeping" in the twins' room, defendant testified, "That never happened." He admitted on direct examination that one morning when he went to kiss the twins before leaving for work, he saw Norma sleeping in the bed in the twins' room and had been "tempt[ed]" to "raise[] the blanket" and "see her," but that he had not in fact done so and instead only pulled the blanket on top of Norma as it was starting to fall to the floor.

(ECF No. 10-1 at 2-12.)

## III. STANDARD OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in [*sic*] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

Additionally, Petitioner's habeas claims are subject to the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997) (Federal courts reviewing any petition filed in federal court after the April 24, 1996 enactment of "AEDPA," will apply its provisions). Under AEDPA, the standard of review for Petitioner's habeas claims, is as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the

merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Clearly established Federal law," as understood in the context of § 2254(d)(1), consists of holdings of Supreme Court decisions. *Williams v. Taylor*, 529 U.S. 362, 365 (2000) (stating that the phrase "clearly established Federal law," as determined by the United States Supreme Court, refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision"). In order to grant habeas corpus relief, a federal habeas court must rule out whether it is possible that "fair-minded jurists" could disagree that the decision is inconsistent with clearly established federal law. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). To satisfy § 2254(d)(2), a petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Where, as here, there is no reasoned decision from the state's highest court on appeal, the federal habeas court "looks through" to the underlying appellate decision to determine whether AEDPA's standard for habeas relief is met. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *see also Harrington*, 562 U.S. at 99-100 (holding that an unexplained denial of a claim by the California Supreme Court is an adjudication on the merits of the claim and is entitled to deference unless "there is reason to think some other explanation for the state court's decision is likely"). Therefore, the appellate decision before this Court is the California Court of Appeal's March 23, 2018, written decision affirming Petitioner's conviction. (ECF No. 10-1.)

/ / / / /

# IV.   DISCUSSION

As set forth above, Petitioner seeks relief from his convictions on the grounds that (1) the burden of showing that facially time-barred charges were committed within the statute of limitations is beyond a reasonable doubt and not a preponderance of the evidence, and (2) the jury instructions to the contrary violated the Due Process Clause.  (*See* ECF No. 13.)  "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  Petitioner contends that "the facts that revive a time-barred action or exempt it from the normal statute of limitations are directly linked to criminal culpability because otherwise there would be no prosecution."  (FAP at 14.)  Therefore, the civil burden of preponderance of the evidence is inapplicable.  (*Id.*)

In addition, Petitioner contends "that the rationale of [*People v. McGill*, 10 Cal. App. 2d 155, 157 (1935)] and the cases following it are incorrect and that jury instructions that apply that standard violate the Fifth, Sixth and Fourteenth Amendments to the United States Constitution."  (*Id.*)  Petitioner contends that the trial court's instruction that proof of timely commencement need be only by a preponderance of the evidence violates the Due Process Clause.  (*Id.* at 28.)  Therefore, Petitioner claims that "reversal should be granted to correct this Federal Constitutional error."  (*Id.* at 7.)

## A.   Background

With respect to the statute of limitations issue raised by Petitioner, the California Court of Appeal provided the following additional background:

> The record shows the information alleged counts 7, 8, and 9 involving P.M. occurred between August 22, 2000 and September 6, 2002, when P.M. was between six and eight years old.  The record further shows the prosecution of defendant on these counts commenced in October 2014 with the filing of a felony complaint.

> Although the parties discussed the jury instructions including any proposed changes to them, the record shows the

defense did not object to the court giving a modified version of CALCRIM No. 3250, titled "Statute of Limitations, Minor Victim, Filed before 28th Birthday," after the court referenced it along with the other instructions and asked the parties if they had any questions with respect to the instructions.

CALCRIM No. 3250,[4] as modified by the court, provided:

> "The People have the burden of proving the defendant is guilty of the charged offenses beyond a reasonable doubt. If you find the defendant guilty of Lewd Act upon a Child, as charged in Counts 7 through 9, you must then decide whether, as to each crime, the People have proved the following factual allegation by a preponderance of the evidence: [¶] 1) The victim was under 18 when the crime occurred; and [¶] 2) This action commenced before the victim's 28th birthday.

> "Proof by a *preponderance of the evidence* is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

> "If the People have not met the burden of proving this allegation by a preponderance of the evidence, you must find that the allegation has not been proved.

> "You must return a separate finding on the factual allegations required for each crime charged in Counts 7, 8, and 9."

. . .

[T]he prosecution proceeded on the theory that former section 801.1 governed the statute of limitations with respect to P.M. and counts 7, 8, and 9. Former section 801.1 was enacted

---

[4] (footnote in original) CALCRIM No. 3250 is a "template" instruction that is used when "any enhancements, sentencing factors, or factual issues" are submitted to the jury that are not otherwise covered in previous instructions.

in 2004, effective January 1, 2005.[5] (Stats. 2004, ch. 368 (A.B. 1667), § 1.) When originally enacted, this statute provided, "Notwithstanding any other limitation of time described in this chapter, prosecution for a felony offense described in subparagraph (A) of paragraph 2 of subdivision (a) of Section 290 shall be commenced within 10 years after commission of the offense."

Section 801.1 was amended a year later (Stats. 2005, ch. 479 (S.B. 111), § 2) to add subdivision (a), which is the provision relied on by the parties and the trial court in the instant case.[6] It provides in relevant part, "Notwithstanding any other limitation of time described in this chapter, prosecution for a felony offense described in Section . . . 288 . . ., that is alleged to have been committed when the victim was under the age of 18 years, may be commenced any time prior to the victim's 28th birthday."

_____

[5] (footnote in original) When former section 801.1 became effective in 2005, defendant already was subject to a six-year statute of limitations for the crimes he committed against P.M. between August 2000 and September 2002. (See former § 800 [providing in part that a "prosecution for an offense punishable by imprisonment in the state prison for *eight years or more shall be commenced within six years after commission of the offense*" (italics added)]; & former § 288, subd. (a) [providing in part that a "person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years" with the requisite intent "is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or *eight years*" (italics added)].) Because the applicable statute of limitations had not yet run against defendant when section 801.1 became effective in 2005, there is no ex post facto clause violation in this case, as defendant correctly recognizes. (See *Stogner v. California* (2003) 539 U.S. 607, 617–621, 632-633 (*Stogner*) [noting the ex post facto clause prohibits the *revival* of a time-barred prosecution, but not the *extension* of a limitations period *before* the prior limitations period has expired].)

[6] (footnote in original) Section 801.1 was further amended in October 2007 (stats. 2007, ch. 579 (S.B. 172), § 40, eff. Oct. 13, 2007), but that amendment did not change subdivision (a) of former section 801.1. Effective January 1, 2017, current section 801.1, subdivision (a) provides the prosecution for a felony offense, including under section 288, which is alleged to have been committed when the victim was under 18 years of age "may be commenced any time prior to the victim's *40th birthday*." (Stats. 2016, ch. 777 (S.B.813), § 2, italics added.)

19-cv-00337-CAB (JLB)

(ECF No. 10-1 at 13-15.)

## B. Analysis

### 1. Applicable Statute of Limitations

On October 24, 2014, a complaint was filed against Petitioner charging him with nine violations of California Penal Code § 288(a) and an arrest warrant was issued. (ECF No. 10-7 at -14, 20-28.) These actions fixed the date of commencement of the prosecution as well as the ending date of the statute of limitations. *See* Cal. Penal Code § 804; *see also People v. Smith*, 98 Cal. App. 4th 1182, 1186 (2002). On April 3, 2015, an information was filed against Petitioner charging him with the same nine violations of California Penal Code § 288(a). (ECF No. 10-7 at 15-19.) The information specifically charged Petitioner with three violations against P.M., stating in part: "On or about and between August 22, 2000 and September 6, 2002, [Petitioner] did willfully and lewdly commit a lewd and lascivious act upon and with the body and any part and member thereof of [P.M.], a child under the age of fourteen years . . . ." (*Id.* at 18.)

At the time Petitioner was charged, the following statute of limitations was in effect for Penal Code § 288(a):

> § 801.1(a): Notwithstanding any other limitation of time described in this chapter, prosecution for a felony offense described in Section . . . 288 . . . , that is alleged to have been committed when the victim was under the age of 18 years, may be commenced any time prior to the victim's 28th birthday.

Cal. Penal Code § 801.1(a) (2007).

Petitioner does not dispute the applicability of this statute of limitations. (*See* ECF No. 13 at 15-16.) Petitioner also does not dispute the Court of Appeal's finding that P.M. was under the age of 18 years old at the time the violations were committed, and that the prosecution was commenced prior to P.M.'s 28th birthday. In this regard, the Court of Appeal stated:

> Here, we conclude there is substantial evidence in the record to support the jury's findings that the prosecution of counts 7, 8, and 9 was timely

commenced under subdivision (a) of former section 801.1. (See *People v. Ruiloba* (2005) 131 Cal. App. 4th 674, 681–682 [noting that when an issue involving a statute of limitations has been tried, as was the case here, an appellate court reviews the record to determine whether substantial evidence supports the findings of the trier of fact]; *People v. Padfield* (1982) 136 Cal. App. 3d 218, 225-226 (*Padfield*) [noting that, when "it cannot be said that as a matter of law the statutory period has run, the issue is a question of fact for the trier of fact" and that on appeal, "the issue is tested by the substantial evidence standard"].)

Indeed, the record shows the offenses involving P.M. were alleged to have been committed between August 2000 and September 2002, when she was between six and eight years old. Moreover, as noted the prosecution was "commenced" for purposes of subdivision (a) of former section 801.1 in October 2014, when the felony complaint was filed, clearly well before P.M.'s 28th birthday. As such, we conclude the prosecution of counts 7, 8, and 9 was commenced within the applicable statute of limitations. (See former § 801.1, subd. (a).)

(ECF No. 10-1 at 15-16.)

Petitioner suggests that the charges were "facially time-barred." (See ECF No. 13 at 15.) However, the charging document alleges that the violations were committed when P.M. was under 14 years old, and if P.M. was under 14 years old in September 2002, she would be under 28 years old at the time the prosecution was commenced in October 2014. Therefore, there is nothing to suggest that the charges were time-barred on their face.

Petitioner also concedes in his FAP that "the amendment to section 801.1 did not, in this case 'revive a previously time-barred prosecution.'" (ECF No. 13 at 16.) Therefore, as the Court of Appeal held, *Stogner v. California*, 539 U.S. 607 (2003), does not apply:

> *Stogner* merely involved the issue of whether a statute of limitations for a criminal prosecution that had expired could be revived by statute without violating the ex post facto clause. As noted (see fn. 5, *ante*), this is *not* an issue in the instant case because former section 801.1, subdivision (a) merely *extended* the unexpired statute of limitations for the criminal prosecution of defendant on counts 7, 8, and 9. (See *Stogner*, *supra*, 539 U.S. at p. 618 [noting that "courts have upheld extensions of *unexpired* statutes of limitations (extensions that our holding today does not affect [citation])"].) *Stogner* is thus inapposite in the instant case.

(ECF No. 10-1 at 19.)

## 2. California Law

Petitioner contends that the rationale of *McGill* and the cases following it "are incorrect and that jury instructions that apply that standard violate the Fifth, Sixth and Fourteenth Amendments to the United States Constitution." (FAP at 14.) In *McGill*, a California court of appeal addressed a provision of the California Penal Code which provided that:

> An indictment for any other felony than murder, the embezzlement of public money, or the falsification of public records, must be found, or an information filed, within three years after its commission.

*McGill*, 10 Cal. App. 2d at 156.

The provision further provided the following:

> If, when the offense is committed, the defendant is out of the state, the indictment may be found or an information filed within the term herein limited after his coming within the state, and no time during which the defendant is not an inhabitant of, or usually resident within this state, is part of the limitation.

*Id.* at 156-57.

On appeal, the appellant contended "that 'the burden of proof was upon the state to prove that the defendant was absent from the state. The People failed to establish this burden of proof beyond a reasonable doubt and to a moral certainty.'" *Id.* at 159. The court rejected this contention, concluding:

> In that connection it would appear to be the rule that, in circumstances such as are here presented, the duty devolves upon the People both to allege and to prove the fact of defendant's absence from the state for a period of time sufficient to prevent the full operation of the bar to the prosecution of the action. (*State v. Bilboa*, 38 Idaho, 92 [213 Pac. 1025, 222 Pac. 785]; *State v. Steensland*, 33 Idaho, 529 [195 Pac. 1080, 13 A. L. R. 1442]; *People v. Miller*, 12 Cal. 291; and see generally monographic note, 13 A. L. R. 1449; 16 Cor. Jur. 530; 37 Cor. Jur. 1243 et seq.; 4 Wigmore on Evidence, p. 3586.) But it is to be noted that none of such authorities goes to the length of declaring that the burden of proof requires that the absence of defendant from the state must

18

be established beyond a reasonable doubt.  As a general rule, as far as this state is concerned, the doctrine of reasonable doubt extends to evidence by which "every material issue" of the corpus delicti is sought to be proved.  (8 Cal. Jur. 182.)  However, it should be clear that the facts which prove the existence of the corpus delicti are entirely distinct and separate from those by which the liability of the defendant to be prosecuted for the commission of the crime are sought to be established; and that, although the right to maintain the action is an essential element in the final power to pronounce judgment, that element constitutes no part of the crime itself.

*Id.*

The California Court of Appeal in this action cited at least one case that cited *McGill—People v. Zamora*, 18 Cal. 3d 538, 566 (1976)—in concluding that "while the elements of former section 801.1, subdivision (a) were necessary to convict [Petitioner] on counts 7, 8, and 9 . . . , they did not need to be proven beyond a reasonable doubt because they did not bear upon [Petitioner's] guilt vis-à-vis his innocence, such that there was the risk of an innocent [person] . . . being condemned." ECF No. 10-1 at 19 (internal citations and quotation marks omitted).  Specifically, the Court of Appeal in this action held as follows:

> Initially, we note that *none* of the facts relevant to the statute of limitations, including its extension thereof, was a "fact necessary to constitute the crime with which [defendant was] charged." (See *In re Winship* (1970) 397 U.S. 358, 364 (*Winship*) [noting the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he [or she] is charged"]; see also *United States v. Booker* (2005) 543 U.S. 220, 230 [same]; & *People v. Linder* (2006) 139 Cal. App. 4th 75, 84 (*Linder*) [noting that, "[a]lthough the right to maintain the action is an essential part of the final power to pronounce judgment, that right 'constitutes no part of the crime itself' [citation]"].) Nor were any facts relevant to the statute of limitations used to establish or increase punishment. (See, e.g., *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [noting that every finding that increases the punishment possible for an offense must be submitted to the jury and proved beyond a reasonable doubt].)

Moreover, although the prosecution has the burden of proof of "'every ingredient of an offense beyond a reasonable doubt'" (*Sandstrom v. Montana* (1979) 442 U.S. 510, 524; *Winship*, *supra*, 397 U.S. at p. 364), the statute of limitations is not an ingredient of an offense but a substantive matter for which the prosecution's burden of proof is a preponderance of the evidence. (See *People v. Zamora* (1976) 18 Cal. 3d 538, 566, fn. 27 (*Zamora*) [noting that for the statute of limitations, the "proper burden is a preponderance of the evidence and thus when a limitation issue goes to the jury the preferable practice should be to carefully instruct the jury as to that burden making it clear the lesser burden applies solely to the limitation issue"]; *People v. Mahoney* (2013) 220 Cal. App. 4th 781, 790 [noting the People had the burden to prove "by a preponderance of the evidence" that the defendant possessed child pornography within the 10-year statute of limitations applicable to a violation of section 311.11, subdivision (a)]; *People v. Castillo* (2008) 168 Cal. App. 4th 364, 369 [noting that the People have the burden of proving the criminal action was commenced within the applicable limitations period and that this "burden of proof is by a preponderance of the evidence"]; *People v. Smith* (2002) 98 Cal. App. 4th 1182, 1187 [noting that because a statute of limitations is not an element of the offense, the "prosecutor need only demonstrate that the crime occurred within the applicable statute of limitations by a preponderance of the evidence"]; *People v. Le* (2000) 82 Cal. App. 4th 1352, 1360 [noting the statute of limitations is a "matter which the prosecution must prove by a preponderance of the evidence"], citing *Cowan v. Superior Court* (1996) 14 Cal. 4th 367, 374; and *Padfield*, supra, 136 Cal.App.3d at p. 226 [noting the "People bear the burden of proof on the statute of limitations issue and that burden is one of preponderance of the evidence"].)

Thus, California law overwhelming rejects defendant's contention that a statute of limitations is an element of an offense and as such, that the burden of proof is beyond a reasonable doubt and not preponderance of the evidence. Despite this overwhelming legal authority, defendant contends the Supreme Court decision in *Stogner*, *supra*, 539 U.S. 607—which predates much of it—requires proof beyond a reasonable doubt that the prosecution was commenced within the applicable statute of limitations. We disagree.

In *Stogner*, the court held that a newly enacted statute of limitations for child molestation (§ 803, subd. (g)) could not be used to revive a time-barred prosecution without violating ex post facto principles. (*Stogner*, *supra*, 539 U.S. at pp. 618–619.) In so doing, the *Stogner* court disapproved of our high court's decision in *People v. Frazer* (1999) 21 Cal.4th 737, 763 (*Frazer*), which had concluded that "it makes no difference for ex post facto purposes whether a postcrime change in the statute of limitations 'revive[s] a

20

prosecution already dead' or 'give[s] it a longer lease of life.'" In disagreeing with this aspect of *Frazer*, the Court in *Stogner* ruled the "resurrection of otherwise timebarred criminal prosecutions . . . enacted *after* pre-existing limitations periods ha[ve] expired" violates the ex post facto clause. (*Stogner*, at p. 609.)

Stogner merely involved the issue of whether a statute of limitations for a criminal prosecution that had expired could be revived by statute without violating the ex post facto clause. As noted (see fn. 5, *ante*), this is *not* an issue in the instant case because former section 801.1, subdivision (a) merely *extended* the unexpired statute of limitations for the criminal prosecution of defendant on counts 7, 8, and 9. (See *Stogner*, *supra*, 539 U.S. at p. 618 [noting that "courts have upheld extensions of *unexpired* statutes of limitations (extensions that our holding today does not affect [citation])"].) *Stogner* is thus inapposite in the instant case.

We conclude that, while the elements of former section 801.1, subdivision (a) were necessary to convict defendant on counts 7, 8, and 9 (see *Linder*, *supra*, 139 Cal. App. 4th at p. 84), they did not need to be proven beyond a reasonable doubt "because they did not bear upon [defendant's] guilt vis-à-vis his innocence, such that there was the risk of an 'innocent [person] . . . being condemned.'" (See *Renderos v. Ryan* (2006) 469 F.3d 788, 796-797 [rejecting argument that jury should have been required to find beyond a reasonable doubt the elements to trigger an extension of the applicable statute of limitations and noting petitioner failed to "identify any Supreme Court precedent clearly establishing that statutes of limitations must be proved beyond a reasonable doubt"], citing *Winship*, *supra*, 397 U.S. at p. 364.) We thus reject defendant's contention that commencement of a criminal prosecution within an applicable statute of limitations must be proved under the beyond a reasonable doubt standard. [footnote omitted]

(ECF No. 10-1 at 16-19.)

To the extent Petitioner asks this Court to review California law, the Court cannot do so. "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 67-68 (citing 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam)).

Accordingly, the Court turns to Petitioner's argument that the prosecution's failure to prove the statute of limitations beyond a reasonable doubt violated clearly established federal law.

### 3.    Clearly Established Federal Law

"The requirement that *guilt* of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation." *In re Winship*, 397 U.S. 358, 361 (1970) (emphasis added).  As explained by the Supreme Court in *In re Winship*:

> The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure.  It is a prime instrument for reducing the risk of convictions resting on factual error.  The standard provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law.
>
> . . .
>
> The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons.  The accused during a criminal prosecution has at stake interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction.  Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt.

*Id.* at 363-64 (internal quotations and citations omitted).  Accordingly, the Supreme Court held "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 364.

Petitioner contends that *In re Winship* requires the People to plead and prove the statute of limitations beyond a reasonable doubt.  (*See* ECF No. 13 at 14.)  As set forth above, the California Court of Appeal disagreed.  For the reasons set forth below, the Court finds that the California Court of Appeal's decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court law.

The Ninth Circuit addressed this question in *Renderos v. Ryan*, 469 F.3d 788 (9th Cir. 2006) and held that the California Court of Appeal was not objectively unreasonable in its application of Supreme Court due process law in rejecting the petitioner's claim that "prevailing federal constitutional law concerning the burden of proof in criminal cases requires us to now declare the factual allegations concerning the statute of limitations should be deemed an element of the offense that must be established beyond a reasonable doubt." *Id.* at 796. As in *Renderos*, Petitioner here has not identified any Supreme Court precedent clearly establishing the statute of limitations must be proven beyond a reasonable doubt. *See id.*; *see also Dozier v. Palmer*, No. 3:08-CV-00190-RCJ, 2011 WL 3419568, at *12 (D. Nev. Aug. 2, 2011) ("There is no United States Supreme Court case which clearly establishes that the statute of limitations must be proven beyond a reasonable doubt.").

On the contrary, Supreme Court law indicates the opposite. In *Smith v. United States*, 568 U.S. 106 (2013), the Supreme Court stated:

> The State is foreclosed from shifting the burden of proof to the defendant only "when an affirmative defense does negate an element of the crime." *Martin v. Ohio*, 480 U.S. 228, 237, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987) (Powell, J., dissenting). Where instead it "excuse[s] conduct that would otherwise be punishable," but "does not controvert any of the elements of the offense itself," the Government has no constitutional duty to overcome the defense beyond a reasonable doubt. *Dixon v. United States*, 548 U.S. 1, 6, 126 S.Ct. 2437, 165 L.Ed.2d 299 (2006).
>
> . . .
>
> [A]lthough the statute of limitations may inhibit prosecution, it does not render the underlying conduct noncriminal. Commission of the crime within the statute-of-limitations period is not an element of the conspiracy offense. *See United States v. Cook*, 17 Wall. 168, 180, 21 L.Ed. 538 (1872). The Government need not allege the time of the offense in the indictment, *id.,* at 179–180, and it is up to the defendant to raise the limitations defense, *Biddinger v. Commissioner of Police of City of New York*, 245 U.S. 128, 135, 38 S.Ct. 41, 62 L.Ed. 193 (1917). A statute-of-limitations defense does not call the criminality of the defendant's conduct into question, but rather reflects

a policy judgment by the legislature that the lapse of time may render criminal acts ill suited for prosecution.

*Id.* at 110-12.

Similarly, in *Dixon v. United States*, 548 U.S. 1, 6 (2006), the Supreme Court stated that where a defense "excuse[s] conduct that would otherwise be punishable," but "does not controvert any of the elements of the offense itself," the Government has no constitutional duty to overcome the defense beyond a reasonable doubt. *Id.* at 6-8. More recently, in *Musacchio v. United States*, 136 S. Ct. 709, 717-18 (2016), the Supreme Court explained the following:

> The history of the limitations bar in [18 U.S.C.] § 3282(a) demonstrates that it is a defense that becomes part of a case only if the defendant presses it in the district court. This Court held in *United States v. Cook*, 17 Wall. 168, 21 L.Ed. 538 (1872), that a statute of limitations—identical in all relevant respects to § 3282(a)—was "a matter of defence and must be pleaded or given in evidence by the accused." *Id.*, at 181; *see* § 32, 1 Stat. 119 (statute of limitations); *see also Cook*, *supra*, at 173, and n. * (citing and describing statute of limitations). When a defendant introduces the limitations defense into the case, the Government then has "the right to reply or give evidence" on the limitations claim. 17 Wall., at 179.
>
> *Cook* was decided more than 140 years ago, and we have adhered to its holding. Just three Terms ago, we reaffirmed that "[c]ommission of [a federal] crime within the statute-of-limitations period is not an element of the . . . offense," and "it is up to the defendant to raise the limitations defense." *Smith v. United States*, 568 U.S. ——, ——, 133 S.Ct. 714, 720, 184 L.Ed.2d 570 (2013) (citing *Cook* ; emphasis deleted); *see also Biddinger v. Commissioner of Police of City of New York*, 245 U.S. 128, 135, 38 S.Ct. 41, 62 L.Ed. 193 (1917) ("The statute of limitations is a defense and must be asserted on the trial by the defendant in criminal cases ..." (citing *Cook*)). There is, in sum, a long history of treating the operative language in § 3282(a) as providing a nonjurisdictional defense that a defendant must press at trial to insert into the case.

*Id.* at 717-18.

Accordingly, the California Court of Appeal was not objectively unreasonable in its application of Supreme Court due process law in rejecting Petitioner's claim that the statute of limitations must be proven beyond a reasonable doubt.

### 4. Jury Instructions

When a petitioner challenges a jury instruction on a habeas petition, "[t]he only question . . . is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). "[T]he instruction . . . must be considered in the context of the instructions as a whole and the trial record." *Id.* "If the charge as a whole is ambiguous, the question is whether there is a 'reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.'" *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam) (quoting *Estelle*, 502 U.S. at 72). A "reasonable likelihood" is lower than "more likely than not" but higher than a mere "possibility." *See Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

As Petitioner does not contend that the California Court of Appeal erred in its finding that there was "substantial evidence in the record to support the jury's findings that the prosecution of counts 7, 8, and 9 was timely commenced" under former California Penal Code § 801.1(a), the Court finds that Petitioner has failed to establish that the instruction by itself so infected the entire trial that the resulting conviction violates due process.

## V. CERTIFICATE OF APPEALABILITY

The threshold for granting a Certificate of Appealability is "relatively low." *Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002). "[T]he only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 580 U.S. ___, 137 S.Ct. 759, 773 (2017). The district court "shall indicate which specific issue or issues satisfy the standard for issuing a certificate, or state its reasons why a certificate should not be granted." *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

The Court finds, applying that standard, that a Certificate of Appealability is not warranted. The claims and issues raised in this action are not sufficiently meritorious to

deserve encouragement to proceed further, and Petitioner has not shown jurists of reason could disagree with the foregoing resolution.

## V. <u>CONCLUSION AND ORDER</u>

For all the foregoing reasons, the First Amended Petition for a Writ of Habeas Corpus is **DENIED**. The Court **DENIES** a Certificate of Appealability.

Dated: January 23, 2020

_____

Hon. Cathy Ann Bencivengo
United States District Judge